**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION**

| | | |
|---|---|---|
| MATTHEW POWE, | ) | CASE NO. 1:20-cv-00484 |
| | ) | |
| Plaintiff, | ) | JUDGE DONALD C. NUGENT |
| | ) | |
| v. | ) | MAGISTRATE JUDGE |
| | ) | JONATHAN D. GREENBERG |
| ANDREW SAUL, | ) | |
| Commissioner of Social Security, | ) | |
| | ) | **REPORT AND** |
| Defendant. | ) | **RECOMMENDATION** |

Plaintiff, Matthew Powe, ("Plaintiff" or "Powe"), challenges the final decision of Defendant, Andrew Saul,[1] Commissioner of Social Security ("Commissioner"), denying his applications for Disability Insurance Benefits ("DIB") and Supplemental Security Income ("SSI") under Titles II and XVI of the Social Security Act, 42 U.S.C. §§ 416(i), 423, 1381 *et seq.* ("Act"). This Court has jurisdiction pursuant to 42 U.S.C. § 405(g). This case is before the undersigned United States Magistrate Judge pursuant to an automatic referral under Local Rule 72.2(b) for a Report and Recommendation. For the reasons set forth below, the Magistrate Judge recommends that the Commissioner's final decision be AFFIRMED.

---

[1] On June 17, 2019, Andrew Saul became the Commissioner of Social Security.

1

## I.  PROCEDURAL HISTORY

On October 2, 2017, Powe filed an application for DIB and SSI alleging a disability onset date of January 1, 2011 and claiming he was disabled due to hydrocephalus, epilepsy, shoulder replacement, low academic skills, severe migraines, and difficulty gaining weight.  (Transcript ("Tr.") at 226-32, 250.)  The applications were denied initially and upon reconsideration, and Powe requested a hearing before an administrative law judge ("ALJ").  (Tr. 169-70.)

On March 8, 2019, an ALJ held a hearing, during which Powe, represented by counsel, and an impartial vocational expert ("VE") testified.  (Tr. 37-62.)  On May 21, 2019, the ALJ issued a written decision finding Plaintiff was not disabled.  (Tr. 12-36.)  The ALJ's decision became final on February 13, 2020, when the Appeals Council declined further review.  (Tr. 1-6.)

On March 3, 2020, Powe filed his Complaint to challenge the Commissioner's final decision. (Doc. No. 1.)  The parties have completed briefing in this case.  (Doc. Nos. 14 & 15.)  Powe asserts the following assignments of error:

(1)     The Administrative Law Judge erred in failing to grant appropriate weight to the opinion of Dr. Iannotti.

(2)     Substantial evidence does not support the Residual Functional Capacity assessment as assessed by the Administrative Law Judge, in particular limitations resulting from the Plaintiff's migraine headaches.

(3)     The Administrative Law Judge failed to perform a proper symptoms analysis, specifically consideration of the Plaintiff's pain.

(Doc. No. 14 at 25 & 29.)

2

## II.    EVIDENCE

**A.    Personal and Vocational Evidence**

Powe was born in May 1989 and was 21 years-old at the time of his alleged onset date, making him a "younger" person under social security regulations.  (Tr. 17.)  *See* 20 C.F.R. §§ 404.1563 & 416.963.  He has a high school education and is able to communicate in English.  (*Id.* at 28.)  He has no past relevant work.  (*Id.*)

**B.    Relevant Medical Evidence[2]**

**1.    Mental Impairments[3]**

On December 11, 1998, the Powe underwent testing of the Weschsler Intelligence Scale for Children III. (*Id.* at 511-18.)  His results revealed a verbal IQ of 74, performance IQ of 75, and full scale IQ of 73. (*Id.* at 511.) Further testing on the Weschsler Individual Achievement Test revealed a basic reading score of 75, mathematic reasoning score of 87, and spelling score of 75. (*Id.* at 515.)

On April 11, 2002, when Powe was a 13-year-old seventh grader, Weschsler Individual Achievement Test II testing revealed Powe's word reading skills were at a 3.1 grade equivalence, reading comprehension at a 3.5 grade equivalence, numerical operation 5.2 grade equivalence, math reasoning at a 4.2 grade equivalence, spelling at a 4.5 grade equivalence, written expression at a 2.8 grade equivalence and listening comprehension at a 4.5 grade equivalence. (*Id.* at 512.)

An IEP reevaluation team report dated May 12, 2005, while Powe was 15 and in ninth grade, reported that results from intelligence testing from the Wechsler Abbreviated Scale of Intelligence

---

[2]    The Court's recitation of the medical evidence is not intended to be exhaustive and is  limited to the evidence cited in the parties' Briefs.

[3]    Although no error is asserted with regard to Powe's mental functional capacity, the following information was cited by the parties.

3

revealed a verbal IQ of 77, performance IQ 62, and Full Scale of 68.  (*Id.* at 316.) The assessor noted that she administered an abbreviated version of the test and opined "it is likely that previously administered full length I.Q. test results which fell in the borderline deficit range more accurately describe Matt's cognitive ability." (*Id.*)   The same report documented academic skills testing using the Woodcock Johnson Third Edition that revealed a letter word identification at a 3.8 grade equivalence, passage comprehension at a 3.7 grade equivalence, calculation at a 5.7 grade equivalence, applied problems at a 5.1 grade equivalence, spelling at a 5.0 grade equivalence, and writing samples at a  3.7 grade equivalence. (*Id.* at 317.)

Based upon the Adaptive Behavior Assessment System in May 2005, Mr. Powe's overall adaptive skills fell in the borderline deficit range and were consistent with those reported at the initial Multi-Factorial Evaluation.  (*Id.* at 329.)

At his Individualized Education Program for 10th grade on May 15, 2006, Mr. Powe's reading skills were now at the borderline deficient range, with skills estimated at the late third grade level. Spelling skills were in the low average range and at the early fifth grade level, and writing samples fell in the borderline deficit range, with skills estimated at the late third grade range. (*Id*. at 380.)

On May 8, 2008, another reevaluation of Powe's IEP was completed. (*Id.* at 340.)   His academic achievement summary included the following grades:   72 in basic reading, 75 in reading comprehension, 80 in math calculation, 81 in spelling, and 73 in writing.  (*Id*. at 353.)

### 2.    Physical Impairments

At birth, Powe suffered from a Group B Streptococcal Infection and had Streptococcal Ostemyelitis of his left shoulder. He developed Hydrocephalus and had his first ventricular shunt

placed at two and half years old. (*Id*. at 2696.)  Several revisions were performed, and by 2001, he had a three-catheter system with one in the posterior fossa and two in the lateral ventricles.  (*Id*.)

Powe continued to experience headaches and had revisions of his shunts performed due to shunt failure/malfunction in November 2005, January 2006,  February 2006, March 2006, April 2006, and May 2006. (*Id*. at 660, 669, 706, 710 712, 714, 716, 718, 731, 741.)

From October 17, 2007 through October 18, 2007,  Powe was hospitalized at Rainbow Babies and Children's Hospital after a week of progressively worsening headaches with nausea and vomiting on the day before admission.  (*Id*. at 743.)  A CT scan of Powe's head revealed a mild interval increased in signs of the temporal horn of the right lateral ventricle and left lateral ventricle (*Id*. at 744.)  His headache was easily controlled while hospitalized, leading the treatment team to conclude it was not caused by a shunt malfunction, and he was discharged.  (*Id*. at 743.)

From December 20, 2007 through December 21, 2007, Powe was hospitalized at Rainbow Babies and Children's Hospital  for treatment of a headache accompanied by nausea and vomiting, which improved overnight.  (*Id*. at 748.)  A CT scan of Powe's head revealed no significant interval change compared to previous examinations.  (*Id*. at 749.)

On December 13, 2007, Powe was seen by Cleveland Clinic neurologist Dr. Robert Spears, for a consultation regarding Powe's headaches and migraines.  (*Id*. at 1354.)  Powe reported that, beginnig in 2005, he experienced headaches with each episode of shunt obstruction and infection but would be relieved once the obstruction was gone.  (*Id*.)  Beginning in May 2006, he experienced a constant daily headache with an intensity of seven out of ten.  (*Id*.)  Triggers for his headaches included bright lights and loud noises, and he described the headaches as "pounding."  (*Id*. at 1355.) Dr. Spears diagnosed migraine, without an aura, chronic daily headache migrainosus, and status

5

migrainosus.  (*Id*. at 1357.)

On December 26, 2007 and December 27, 2007, Powe underwent infusions for his headaches (*Id*. at 1361, 1365.)  During the second infusion, Powe experienced nausea and chest pain.  (*Id*. at 1366**.)**

On May 7, 2008, Powe returned to Dr. Spears for treatment of his headaches, which had improved to once a month and fifteen to twenty days a month of mild pain. (*Id*. at 1370.)  The headaches were lasting two hours to twenty-four hours, even with medications.  (*Id*.) Powe reported he was playing basketball, exercising, and sleeping normally.  (*Id*. at 1370-71.)   Dr. Spears' observed no pain behaviors, and his  examination revealed tenderness to palpation of temporalis muscles, cervical paraspinal muscles and upper trapezius muscles, but normal cervical range of motion and resting head position, normal gait, equal and symmetrical reflexes, and no evidence of motor, sensory or cerebellar defects.  (*Id*. at 1371.)

On July 4, 2010, Powe was seen at University Hospital after having a seizure while swimming.  (*Id*. at 1224.)  He only experienced a minimal headache afterwards.  (*Id*. at 1224.)  A CT scan of Powe's brain demonstrated that the three shunts were in place and no acute intracranial process.  (*Id*. at 1250.)

On July 16, 2010, Dr. Dileep Nair, a neurologist in the epilepsy clinic at Cleveland Clinic, examined Mr. Powe in follow up for his seizures. (*Id*. at 1377.) An EEG suggested generalized epilepsy, and Dr. Nair estimated the risk for recurrant seizures to be around 60-80%.  (*Id*.)  He prescribed Lamictal, and advised Powe not to swim unsupervised, bathe, drive, use heavy machinery or sharp moving objects, and to avoid heights.  (*Id*.)

From November 1, 2010 through November 2, 2010 Powe was hospitalized at Rainbow

Babies and Children's Hospital for a headache that began the night before and several episodes of nausea and vomiting. (*Id*. at 757.) A CT scan of Powe's brain taken November 1, 2010, showed no significant changes compared to a previous MRI taken October 8, 2008. (*Id*. at 755.) The assessment was a headache with a ventriculoatrial shunt. (*Id*. at 758.)

On April 27, 2011, a CT scan of Powe's brain showed ventricular shunt tube and post-surgical changes. (*Id*. at 1244.) Compared to testing from July 4, 2010, there has been increased dilatation of the temporal horn of the left lateral ventricle, but otherwise "no significant change." (*Id*.)

 On May 2, 2011, an MRI of Powe's left shoulder revealed irregular morphology of the inferior margin of the humeral head unclear if related to a remote trauma with focal exostosis, glenohumeral joint arthrosis with mild irregularity subarticular bone plate along the inner margin, no full-thickness rotator cuff tear, and low-grade partial intrasubstance tear mid subscapularis tendon. (*Id*. at 1240-41.)

On August 1, 2011, Powe returned to Dr. Nair and reported no seizure activity since last being seen. (*Id*. at 1384.) Dr. Nair diagnosed Powe with seizure, likely genetic and possibly related to his congenital hydrocephalus. (*Id*. at 1387).

On November 28, 2011, a CT scan of Powe's brain demonstrated a slight increase in dilatation of the temporal horn of the right lateral ventricle and slight increase in transependymal edema. (*Id*. at 1235- 36.)

On October 28, 2011, Powe sought treatment at the University Hospital Emergency Department for a migraine-like headache that had lasted a couple of days. (*Id*. at 1214.) This headache was unusual as it was generalized, but most pronounced behind his left eye and he

7

experienced some nausea and vomiting.  (*Id*.)  Powe's was treated with medications including Toradol, Dilaudid, Zofran, and Phenergan.  (*Id*. at 1220-21).  His was diagnosed with headaches and leukocytosis, and he was transferred to the Cleveland Clinic.  (*Id*. at 1215, 1220.)

From November 28, 2011 through November 30, 2011, Powe was hospitalized at Cleveland Clinic for treatment of generalized headaches, with nausea, which he described as similar to his migraine episodes.  (*Id*. at 1827.)  A CT scan of Powe's brain revealed normal size ventricles which were stable in size compared to CT scan taken in October 2011.  (*Id*. at 1828.)  Powe reported that the migraines were occurring two times per week.  (*Id*. at 1829.)  His current headaches had no precipitating factors, but once initiated involved photophobia and phonophobia with nausea and vomiting and Motrin did not help.  (*Id*.)  A shunt series demonstrated no abnormalities.  (*Id*. at 1832.)  The discharge diagnosis was a migraine headache.  (*Id*. at 1836.)

On February 28, 2012, Powe sought treatment from Dr. Mark Luciano at the Cleveland Clinic for his hydrocephalus, and reported that he was doing well.  (*Id*. at 1394.)  Dr. Luciano's diagnosis was functioning three-catheter ventriculoatrial shunts placed when he was two years old due to hydrocephalus.  (*Id*. at 1396.)

On September 24, 2012, Powe saw Susan Stanton, PA-C, for a follow-up appointment regarding seizures.  (*Id*. at 1398.)  Powe reported that he was not driving and was doing better since he last saw Dr. Luciano (*Id*. at 1399.)  Powe reported having three seizures in the past year which was an increase in frequency since he had only one prior seizure.  (*Id*. at 1398.)  Following the third seizure, his dosage of Lamictal was increased.  (*Id*.)

On January 18, 2013, Powe sought care at the University Hospital Emergency Department after having two seizures after drinking alcohol the previous night.  (*Id*. at 1208.)  He also had a

headache and some nausea and vomiting, and frequently experienced nausea and headaches after his seizures.  (*Id*.)  A CT scan of Powe's brain revealed redemonstration of three ventriculostomy tubes and perhaps slight increased dilation of the temporal horn of the left lateral ventricle since previous study of November 28, 2011.  (*Id*. at 1233.)   Powe was transferred to Cleveland Clinic.  (*Id*. at 1212.)

 From January 18, 2013 through January 20, 2013, Powe was hospitalized at Cleveland Clinic.  (*Id*. at 1809-15.)  His examination was normal except for slight tenderness on the right lower quadrant.  (*Id*. at 1809.)  A CT scan of Powe's brain showed that his ventricular size was stable as compared to previous study.  (*Id*.)  A shunt series was normal.  (*Id*. at 1815.)  Powe's diagnosis was generalized epilepsy.  (*Id*. at 1814.)

On March 6, 2013, Powe returned to Dr. Nair, and reported seizures on July 4, 2010, January 2012, July 2012, August 2012, and January of 2013 in which he had three seizures in one day.  (*Id*. at 1405.)  Most of the seizures were triggered by alcohol.  (*Id*.)  Dr. Nair diagnosed generalized epilepsy and increased his dosage of Lamictal.  (*Id*. at 1409.)

On April 30, 2013, Dr. Reuben Gobezie performed surgery on Powe, including biological shoulder resurfacing with an osteocohondral graft, arthroscopic subacromial decompression, arthroscopic extensive debridement, and open subpectorial biceps tenodesis of the left shoulder for severe osteoarthritis post-traumatic, seizure disease and biceps tendinitis.  (*Id*. at 873.)

On May 14, 2013, an MRI of Powe's left shoulder revealed degenerative changes of the left glenohumeral joint, post-surgical changes with proximal left humeral surgical anchor, rounded lucencies were present within the proximal left humerus and correlate with concern for multiple lytic bone lesions.  (*Id*. at 851.)

On May 25, 2013, Powe sought care at the University Hospital Emergency Department for nausea, vomiting, and headaches which he had been getting migraine headaches.  (*Id*. at 1203.) Powe was given Dilaudid and Zofran. (*Id*. at 1205.) A CT scan of Powe's brain revealed three ventriculoperitoneal shunts in unchanged positions, and there was slight progressive dilation of the temporal horn of the left lateral ventricle.  (*Id*. at 1207.)

On August 5, 2013, Powe saw Megan Granke, PA-C, for a follow-up appointment regarding his seizures, and reported that he had no seizures since the Lamictal was increased, and after he stopped alcohol binging. (*Id*. at 1414.)  PA Granke reported that a continuous video-EEG from January 20, 2013, supported the diagnosed of mild diffuse encephalopathy with maximal involvement of the right hemisphere.  (*Id*. at 1415.)  She diagnosed generalized epilepsy with a history of congenital hydrocephalus with multiple shunt revision.  (*Id*. at 1418.)

On October 13, 2013, Powe sought care at University Hospital Emergency Department for a headache with blurry vision and vomiting. (*Id*. at 1196.) A CT of Powe's brain revealed multiple ventriculoperitoneal shunts and a stable appearance since the prior exam.  (*Id*. at 1201.)  Powe was given Decadron, Benadryl, Reglan, Tylenol, Zofran, and Dilaudid.  (*Id*. at 1198-99.)  His diagnoses included headache, nausea and vomiting, and possible shunt failure, and he was transferred to the Cleveland Clinic.  (*Id*. at 1198.)

From October 14, 2013 to October 15, 2013, Powe was hospitalized at the Cleveland Clinic for treatment of a throbbing headache with photophobia, nausea, vomiting and drowsiness that were different from his usual headaches.  (*Id*. at 1787-98.) On admission, Powe had language dysarthritic from pain medications, ataxia in the bilateral upper extremities left greater than right, and was uncooperative with heel to shin testing as he had total body tremors for a few seconds.  (*Id*. at 1788.)

10

A shunt series demonstrated intact shunt system with valve showing to be a high pressure fixed pressures.  (*Id*. at 1789.)  Powe was given a headache cocktail of Toradol, Benedryl, and Zofran and then later a Percocet and felt "much better." (*Id*. at 1794.)  He was discharged on October 15, 2013. (*Id*.)

On February 5, 2014, Powe sought treatment at the University Hospital Emergency Department after a fall on the ice resulted in lightheadedness and left shoulder pain.  (*Id*. at 1190.) An x-ray of Powe's left shoulder revealed moderate hypertrophic degenerative changes of the left glenohumeral joint with probable narrowing of joint space and interval development of multiple small lucent cortical defects measuring up to 0.7 in maximum involving the left humeral head, neck and proximal shaft, possible due to a post-traumatic or post-infectious process.  (*Id*. at 1194.) His discharge diagnoses were closed head injury and left shoulder strain.  (*Id*. at 1190.)

On September 8, 2014, Powe was seen by orthopedist Dr. Joseph Iannotti for an initial evaluation for his left shoulder stiffness.  (*Id*. at 1433.)  Powe reported that, since his left shoulder surgery, his symptoms had recurred.  (*Id*.)  Dr. Iannotti's examination revealed Powe's left shoulder was elevated to 120 degrees and tenderness along the anterior posterior joint line with good external rotation.  (*Id*. at 1430.) Dr. Iannotti diagnosed post-traumatic degenerative arthritis glenohumeral joint left shoulder and failed osteochondral grafting left shoulder.  (*Id*. at 1433.)  An x-ray of Powe's left shoulder revealed moderately advanced degenerative arthritis of the glenohumeral joint with significant remodeling of the glenohumeral articulation, disproportionate for age.  (*Id*. at 2191.)

On October 8, 2014, a CT scan taken of Powe's left shoulder documented severe osteoarthritis.  (*Id*. at 2188-89.)

On October 28, 2014,  Powe underwent a left shoulder hemiarthropathy.  (*Id*. at  1450.)

11

On November 5, 1024, Powe reported his "recovery has been without complications," and he was experiencing no pain.  (*Id*. at 1456.) Nurse Janet Delozier's post-operative examination revealed passive forward elevation to 140 degrees and passive external elevation to 40 degrees. (*Id*.)

On December 1, 2014, Powe returned for his four-week post-operative visit with Dr. Iannotti and reported no pain. (*Id*. at 1460.)  On examination, his passive elevation was 130 degrees, external rotation 50 degrees, and internal rotation was 10 degrees.   (*Id*.)  He had tight posterior capsule limiting the accuracy of his belly press test. (*Id*.)  Dr. Iannotti reported that there was a satisfactory post-operative outcome.  (*Id*.)

On December 27, 2014, Powe sought treatment at the University Hospital Emergency Department for a severe headache which began the night before, accompanied by nausea and vomiting.  (*Id*. at 1183.)  He received morphine, Zofran, Reglan, Benadryl, and Dilaudid with some improvement in his headache, but due to his history he was transferred to Cleveland Clinic for more testing.  (*Id*. at 1184.) A CT scan of Powe's brain showed no changes from a scan taken February 5, 2014.  (*Id*. at 1188.)  The discharge diagnosis was a headache status post ventriculoperitoneal shunt. (*Id*. at 1186.)

On December 28, 2014, Powe was evaluated by Dr. Lee Hwang at the Cleveland Clinic, as he was still having headaches, although his other symptoms had resolved spontaneously.   (*Id*. at 1743.)  After treatment with a headache cocktail he was "much better" and was discharged.  (*Id*. at 1749.)

On January 12, 2015, Powe reported to Dr. Iannotti that he was satisfied with the outcome of his surgery, as  his shoulder pain was "much improved" and he was making progress with his therapy and exercises.  (*Id*. at 1465.)  Dr. Iannotti's examination revealed active elevation of 100

12

degrees in the seated position passively, 30 degrees for external rotation with smooth glenohumeral motion. (*Id*.)

On August 16, 2015, Powe sought treatment at the Cleveland Clinic Emergency Department for a severe headache, generalized pain, some blurry vision, multiple episodes of emesis, worse with bright lights, and worse with loud sounds. (*Id*. at 1717.) He reported photophobia and was diagnosed with acute non-intractable headaches and non-intractable vomiting with nausea. (*Id*. at 1718.) Powe's examination revealed hyperreflexia in the upper extremities which was not new. (*Id*. at 1724.) Powe received Toradol IV, magnesium IV, Benadryl IV, Compazine IV and fluids. (*Id*. at 1725.) He reported that he had a severe headache once a year and his usual headaches occurred twice a month. (*Id*. at 1725.) He was discharged on August 17, 2015 with a diagnosis of migraine variant with headache and hydrocephalus congenital. (*Id*. at 1729.)

On July 2, 2016, Powe sought treatment at the University Hospital Emergency Department for a headache, nausea, diarrhea, and blurred vision. He reported a history of migraines and stated it was difficult to differentiate if the headache was a migraine or if it was the headaches he experienced with his ventriculoperitoneal shunt failures. (*Id*. at 1176.) A shunt series was performed showing there was no obvious discontinuity or kinking with the ventriculostomy shunt catheter. (*Id*. at 1180.) Powe received Toradol, Benadryl, and Reglan, and was discharged with a diagnosis of a headache. (*Id*. at 1178.)

From November 6, 2016 through November 8, 2016, Powe was hospitalized at Fairview Hospital, after seeking treatment at the emergency room due to headache lasting one week that became worse on the day of admission. (*Id*. at 1690.) He hit his head on a friend's car door and since then, had left parietal headaches, sharp in nature with nausea and vomiting. (*Id*.) A CT scan

13

of Powe's brain revealed diffuse enlargement of all ventricular systems compared to prior imaging, transependysmal edema, shunt catheters in left front horn, 3rd ventricle and 4th ventricle, interventricular and fourth ventricular potential septations.  (*Id*. at 1695.) On November 7, 2016, Powe underwent a shunt tap.  (*Id*. at 1699.) He also underwent a shunt revision distal catheter replacement and internalization into abdomen and replacement of a broken valve.  (*Id*. at 1703.) Powe's discharge diagnosis was a shunt malfunction.  (*Id*. at  1712.)

On May 15, 2017, Powe saw Dr. Daniel Mesko,  and reported that his left shoulder was doing better but when he was shoveling snow, he felt a pop anteriorly, and had pain in the anterior and posterior shoulder since then.  (*Id*. at 1492.) On examination, Powe's seated active elevation was about 100 degrees; passive elevation to 130 degrees; external rotation was 30 degrees; and Powe had tenderness to palpation anterior over the proximal incision. (*Id*.) Dr. Mesko noted Powe's weakness of the sub-scapular area appeared to be a chronic issue.  (*Id*.)  He  gave Powe an injection of Kenalog and Lidocaine in his left shoulder.  (*Id*.)

From May 28, 2017 through May 30, 2017, Powe was hospitalized with complaints of left lower quadrant abdominal pain, which he described as unlike his previous shunt malfunctions.  (*Id*. at 1292.) An x-ray of Powe's abdomen revealed the proximal/superior segment of the shunt was not  kinked.  (*Id*. at 1291.) A CT scan of Powe's brain revealed post-surgical changes, small vessel ischemic changes and no acute process.  (*Id*. at 1295-96.)  A neurosurgery consult was performed due to concern for shunt discontinuity.  (*Id*. at 1301.)   The consulting physician concluded that Powe's symptoms were not due to malfunction of the ventriculoperitoneal shunt valve and chest tubing.  (*Id*. at 1303.)

From June 25, 2017 to  July 10, 2017, Powe was hospitalized at Cleveland Clinic after

14

seeking treatment at the Emergency Department for a headache that had progressively worsened over the course of the prior week, with discomfort from his ventriculoperitoneal shunt, chest pain, vomiting, and abdominal pain.  (*Id*. at 1540.) He reported the headache was worse above his left eye but was generalized and diffuse across his head.  (*Id*.)  There was mild tenderness to palpation in the area over the ventriculoperitoneal shunt exit site/valve behind the right ear.  (*Id*. at 1541.) The initial diagnoses were ventriculoperitoneal shunt migration/malfunction, pancreatitis, small bowel obstruction, migraine headaches, cholelithiasis, and tachycardia which was secondary to fluid depletion than a systemic infection.  (*Id*. at 1542.)  A CT scan of Powe's brain performed on June 25, 2017 revealed interval increase in dilation of the ventricular system from May 28, 2017, increased mass effort and evidence of a transependysmal edema but no interval change in positioning of the ventriculostomy catheters.  (*Id*. at 2061-63.)  A CT scan of Powe's abdomen on June 26, 2017, documented no acute findings in the abdomen/pelvis, distended bladder and mild bilateral hydronephrosis, splenomegaly, and right nephrolithiasis.  (*Id*. at 2056-57.)

On June 27, 2017, Powe underwent removal of the ventriculoperitoneal shunt system, placement of right and left external ventricular drains, and externalization of the posterior fossa ventricular catheter for a shunt infection. This was the first of multiple planned, and stage procedures.  (*Id*. at 1561-62.)  A CT scan of Powe's brain documented interval placement of the left frontal approach ventriculostomy catheter; interval improvement in persistent moderate ventriculomegaly interval improvement in the adjacent interstitial edema; but a new small to moderate hemorrhage within the lateral ventricles bilaterally and interval development of small pneumocephalus.  (*Id*. at 2043-44.)

On July 1, 2017, Powe underwent surgery to remove the 4th ventricular catheter and rickham

system and attempt placement of stereotactic 4th ventricular drain for hydrocephalus. (*Id*. at 1601.) His weight was now down to 82 pounds. (*Id*. at 1603.)

On July 2, 2017, a CT scan of Powe's brain revealed interval removal of the ventriculostomy catheter previously terminating in the fourth ventricle and slight redistribution of intraventricular blood produced but no new findings. (*Id*. at 1987-88).

On July 3, 2017, a CT scan of Powe's brainshowed interval decrease without complete resolution in hydrocephalus when compared to prior study and layering blood produced in the occipital horns of the lateral ventricles was unchanged. (*Id*. at 1971-72).

On July 4th, 2017, Powe's weight had decreased to 74 lbs. (*Id*. at 1619.)

On July 5, 2017, an MRI of Powe's brain documented expected post-operative changes status post bilateral external ventricular drain replacement, flair hyperintensity surrounding the external ventricular drain tubes, bilateral intraventricular hemorrhages; mild interval decreased left lateral ventricle, aqueductus stenosis; and moderate narrowing of the right foramen of Monroe with significant stenosis of the left foramen Monroe. (*Id*. at 1934-36.)

On July 6, 2017, a CT scan of Powe's brain revealed intracranial air consistent with shunt manipulation, resolving density with stable volume of intraventricular hemorrhage, and a slight interval decease in size of the lateral and fourth ventricles. (*Id*. at 1909-11.) Powe underwent a third surgery which was a shunt revision with bilateral catheter placement with Y connection of catheters to low pressure valve. (*Id*. at 1630.) Powe also underwent a diagnostic laparoscopy and laparoscopic placement of an abdominal portion of the ventriculoperitoneal shunt. (*Id*. at 1643.)

On July 8th, 2017, a PICC line was placed. (*Id*. at 1645, 1893-95.) The final diagnoses were shunt malfunction and malnutrition of mild degree. (*Id*. at 1651.)

16

On July 17, 2017, Powe saw neurologist Dr. Kaine Onwuzulike, and reported he was doing well, with  headaches were occurring only about once a week, and resolving.  (*Id*. at 1497.)  Dr. Onwuzulike reported that a CT brain scan taken on July 6, 2017, showed intracranial air consistent with shunt manipulations, resolving density with stable volume of intraventricular hemorrhage, and a slight interval decreased in size of lateral and fourth ventricles. (*Id*.)  Dr. Onwuzulike's diagnoses were hydrocephalus status post ventriculoperitoneal shunt and status post recent revision due to infection.  (*Id*. at 1498.)

On July 26, 2017, Powe had a post-operative appointment with Dr. Onwuzulike.  (*Id*. at 1534.)  His stitches were removed and his diagnoses were intracranial air consistent with shunt manipulation, resolving density with stable volume of intraventricular hemorrhage and a slight interval decreased in size of the lateral and fourth ventricles.  (*Id*.)

On August 10, 2017, a CT scan of Powe's brain revealed that the right lateral and fourth ventricles were markedly increased in size since July 6, 2017, the right and left transfrontal ventriculostomy catheters were unchanged, and there was resolution of a small amount of intraventricular hemorrhage.  (*Id*. at 1876-77.) That same day, Powe underwent a right ventriculoperitoneal shunt revision with replacement of the right frontal ventricular catheter and addition of a new Rickman reservoir to the right sided shunt system was performed on August 10, 2017.  (*Id*. at 2744.)

On August 11, 2017, a CT scan of Powe's brain on showed an interval marked reduction in size of the right lateral ventricle.  (*Id*. at 1865-66.) The post-operative diagnosis was a right ventriculoperitoneal shunt malfunction with worsening hydrocephalus.  (*Id*. at 1514.)

On August 31, 2017, Powe saw Jeff Tarcy, PA-C, for a post-operative visit, reporting he was

17

doing well. (*Id*. at 1512-13.) His weight was 104 pounds. (*Id*. at 1513.) PA Tarcy reported that the CT scan performed that day appeared to have some changes in his ventricles but this appears to be due to angulations and his impression was an interval increase in size of the right lateral and fourth ventricles and unchanged position of bifrontal shunt catheters. (*Id*.)

On September 1, 2017, a CT scan of Powe's brain on revealed an interval increase in size of right lateral and fourth ventricles. (*Id*. at 1858.)

From October 7, 2017 to October 14, 2017, Powe was hospitalized at Cleveland Clinic for treatment of headaches, nausea and vomiting, blurred vision and dizziness. (*Id*. at 2765.) The headaches were most prominent in the occipital region and were so severe that they woke him up from sleep. The headaches had been progressively worsening, non-radiating and nothing made them worse but he also had dizziness, photophobia and phonophobia. (*Id*.) His initial diagnosis was nonintractable headaches and hydrocephalus. (*Id*. at 2768.)

On October 8, 2017, Powe underwent a ventriculoperitoneal shunt exploration and revision with 4th ventricular shunt catheter placement with was T-connected the shunt and the Y-connection of bifrontal catheters; valve change to Medtronic, fixed medium pressure valve; replacement of left frontal ventricular catheter with addition of a new Rickman reservoir; replacement of right frontal ventricular catheter; use of AxiEM stealth Neuronavigation system; and added level of complexity given complex shunt system and 4th ventricular component requiring extra time and planning. (*Id*. at 2775.) Powe's weight had decreased to 73 pounds 13.7 oz. (*Id*. at 2783.) His examination revealed rigidity in the upper and lower extremities and strength was 4/5 in the left lower and left upper extremities. (*Id*. at 2783.)

On October 9, 2017, Powe underwent a right lateral ventricle proximal shunt catheter

irritation and shortening and a 4th ventricular proximal catheter shunt revision with shortening of the catheter 1cm.  (*Id*. at 2786.) The final diagnoses included a shunt malfunction, epilepsy seizure generalized convulsive, malnutrition of moderate degree, and hypokalemia.  (*Id*. at 2800.)

From October 16, 2017 to October 20, 2017 Powe was hospitalized for treatment of post-operative headaches, dizziness and nausea with left facial weakness.  (*Id*. at 2807.) Examination revealed left sided facial paralysis and central nerve VII weakness on the left side.  (*Id*. at 2809.) A CT scan of Powe's brain revealed interval decompression of the right lateral ventricle now with slit-like appearance; a significant interval increase in size of the left lateral ventricle and near complete resolution of post-procedural changes.  (*Id*. at 2810.)

On October 19, 2017,  Powe underwent a revision of the left frontal proximal catheter with Neuronavigation, revision of a right posterior auricular valve with CERTAS Valve Setting:5, and interrogation of distal peritoneal shunt tubing.  (*Id*. at  2817.)  Powe's discharge diagnoses were status post ventriculoperitoneal shunt, epilepsy seizures, generalized, convulsive and hypokalemia. (*Id*. at 2819.)

On November 3, 2017, Powe had a follow-up appointment with PA Tarcy and reported his headaches returned on October 25th; he was still taking Percocet and Tylenol but the headaches were pounding and had throbbing pain.  (*Id*. at 2870.)  Powe's weight was 95 pounds.  (*Id*. at 2871.)  PA Tarcy's examination revealed Powe had a left facial palsy with very limited smile, frown, and eyebrow raise, and was unable to fully close his left eye.  (*Id*. at  2872.)  PA Tarcy's diagnoses were post-infections hydrocephalus status post ventriculoperitoneal shunt and status post multiple recent shunt revisions; mild return of headache, multiple recent incision over same areas which do not appear to be healed yet and facial palsy in which he was unable to fully close his left eye.  (*Id*.)

19

From November 5, 2017 to November 6, 2017, Powe was hospitalized at the Cleveland Clinic for treatment of headaches, nausea and vomiting. (*Id*. at 2856). He reported that he did well for one week following his October 19th surgery and then developed a worsening headache. (*Id*. at 2857.) A shunt series was satisfactory and a CT scan of Powe's brain was stable with no significant changes. (*Id*. at 2840, 2842-43.)

On November 20, 2017, Powe saw PA Tarcy for a follow-up appointment and reported he was doing well and that his facial palsy was improving. (*Id*. at 2877.) PA Tarcy's examination revealed left facial palsy that appeared to have improved since the last office visit as Powe could smile, frown, and puff out cheek but with diminished option compared to right face. He still was unable to raise the left eyebrow and could not completely close his left eye. (*Id*. at 2878.) PA Tarcy's diagnoses were post-infection hydrocephalus status post ventriculoperitoneal shunt and status post multiple recent shunt revision; small left frontal hemorrhage seen on CT scan weeks prior; and facial palsy appeared slightly improved. (*Id*. at 2878.)

On December 4, 2017, Powe sought treatment in the Cleveland Clinic Emergency Department for a headache that felt like both a shunt malfunction and a migraine. (*Id*. at 2860.) A shunt series was performed which was satisfactory. (*Id*. at 2844.) Powe reported experiencing a headache which was generalized but mostly over the left eye with nausea, and vomiting. (*Id*. at 2860.) A CT scan of Powe's brain revealed mild decrease in size of the left frontal horn and right temporal horn compared to prior examination, evolution of blood products in the left frontal horn, but otherwise no new changes and no new hemorrhage. (*Id*. at 2850-51.) Powe's diagnoses were acute nonintractable headaches, nausea and vomiting intractability not specified, hydrocephalus, and status post ventriculoperitoneal shunt. (*Id*. at 2863.)

On March 14, 2018, Powe transferred his care for his hydrocephalus and headaches to Dr. Alan Hoffer at University Hospital due to a change in his insurance. (*Id*. at 2994.)  Powe denied any visual or sensory changes, weakness, or balance problems, and stated he was at his baseline. (*Id*.) Powe's weight had increased to 111 pounds and his examination revealed some muscle atrophy in both upper tremors and hands. (*Id*. at 2995.) Dr. Hoffer's diagnosis was history of hydrocephalus. (*Id*. at 2996.) A shunt series revealed no obvious discontinuity of kinking with the portions of the ventriculostomy shunt catheter. (*Id*. at 2998-99.)

On May 16, 2018, Dr. Joseph P. Iannotti competed a physical medical source statement in which he opined that Powe had the following limitations to his physical residual functional capacity:

- lifting twenty pounds occasionally and five pounds frequently due to his left shoulder; and

- rarely able to climb, stoop, kneel, crawl, reach and push or pull due to his left shoulder injury.

(*Id*. at 3002-3003). Dr. Iannotti opined that Powe had severe pain which interfered with his concentration, took him off tasks and caused absenteeism. (*Id*.) Dr. Iannotti stated that Mr. Powe had a past medical history of migraines, seizures, congenital hydrocephalus, and was status post shunt placement and 12 shunt revisions. (*Id*. at 3003.)

On June 25, 2018, Powe sought an evaluation of his left shoulder pain from Dr. Gobezie. (*Id*. at 3080.)  He complained of left shoulder pain which was intermittent, fluctuated, and aggravated by movement. (*Id*.)  He had difficulty falling asleep, joint tenderness, and nocturnal pain and popping. (*Id*.) Dr. Gobezie's examination revealed limited cervical range of motion and a positive Spurling's test; tenderness of the bicep tendon; abnormal strength in the left supraspinatus, and decreased range of motion of the left shoulder. (*Id*. at 3081.)  Dr. Gobezie initially diagnosed a

21

cervical radiculopathy, and prescribed a c-spine MRI.  (*Id*. at 3082.)

On July 17, 2018, Powe returned to Dr. Gobezie, reporting increased left shoulder pain which was worse with lifting, movement and pushing, and reported intermittent numbness.  (*Id*. at 3083.) Dr. Gobezie's examination documented atrophy of the left shoulder, crepitus, diffuse tenderness, and decreased range of motion. (*Id*.)  The doctor's diagnosis was primary osteoarthritis of the left shoulder joint and Powe was given a left glenohumeral joint injection.  (*Id*. at 3084.)

On August 15, 2018, a CT scan of Powe's left shoulder revealed appearance of a degree of glenoid dsyplasia without osseous injury or hardware complication evident.  (*Id*. at 3006.)

On August 23, 2018,  Powe returned to Dr. Gobezie for worsening left shoulder pain., reporting the injection had provided relief for only a few days.  (*Id*. at 3086.)  Powe's range of motion has further decreased and Dr. Gobezie's assessment was bicipital tendinitis of the left shoulder and primary osteoarthritis left shoulder.  (*Id*. at 3087.)

On August 27, 2018, Dr. Gobezie wrote a statement opining Powe had glenohumeral joint osteoarthritis, which caused persistent constant pain, limited range of motion, and significant weakness of the left shoulder.  (*Id*. at 3008.)  Dr. Gobezie opined Powe had limited use of the shoulder and would likely need a reverse total shoulder replacement in the future.  (*Id*.)

On October 19, 2018, Powe had an evaluation with Dr. Gobezie for left shoulder pain, and reported gradual pain that was progressive in the left shoulder and radiated into the left arm, hand, and fingers with rest and increased with any movement.  (*Id*. at 3064.) Dr. Gobezie's examination revealed limited range of motion of the left shoulder and his diagnosis was primary osteoarthritis of the shoulder region.  (*Id*. at 3066.)

On October 26, 2018, Powe underwent a left shoulder reverse total shoulder replacement,

22

resection arthroplasty, and open capsular release with post-operative diagnoses of left shoulder congenital deformity of the glenohumeral joint, severe arthritis of the glenohumeral joint, and failed hemiarthroplasty.  (*Id*. at 3056.)

On October 30, 2018, Powe complained that he was still a bit sore.  (*Id*. at 3092.) There was mild swelling on examination but the incision looked well.  (*Id*. at 3093.)

On November 20, 2018, Powe underwent a physical therapy initial evaluation. Powe had decreased range of motion of the left shoulder and his strength was 2/5.  (*Id*. at 3019.)

On November 28, 2018, Powe sought treatment at the Emergency Department of University Hospital in Parma for a worsening headache, with vomiting.  (*Id*. at 3009.)  He was given morphine, Zofran and IV fluids.  (*Id*. at  3013.)  Powe was diagnosed with headaches and was transferred to University Hospital Main Campus.  (*Id*. at 3014.) At the Main Campus, Powe reported that his headaches was much improved and he did not have any other complaints and he was diagnosed with a headache.  (*Id*. at 3072, 3074.) There was low suspicion for shunt failure.  (*Id*. at 3077.)

From November 29, 2018 to January 3, 2019, Powe participated in physical therapy.  (*Id*. at 3022-40.)

On January 2, 2019,  Powe reported decreased pain, tightness in the left pectoralis, still noted but decreased, and active range of motion improved.  (*Id*. at 3040-41.)

On January 23, 2019, Powe reported to Dr. Gobezie that his pain was decreased to only occasional and that he was doing well.  (*Id*. at 3094.)

On March 28, 2019, Powe sought treatment at the University Hospital Emergency Department for a headache.  (*Id*. at 3104.)  Powe received morphine, Zofran, Reglan and Benadryl. (*Id*. at 3105.)  A CT scan of Powe's brain did not show any changes.  (*Id*. at 3105.)  Powe received

a diagnosis of a headache.  (*Id*. at 3107.)

From March 30, 2019 to March 31, 2019, Powe was hospitalized at University Hospital for treatment of a severe headache with nausea and vomiting.  (*Id*. at 3115.)  Powe underwent a lumbar puncture to rule out a shunt malfunction.  (*Id*. at 3113.)

From April 3, 2019 to April 5, 2019, Powe was hospitalized at University Hospital for treatment of a severe headache with nausea and vomiting.  (*Id*. at 3121.)

**C.**     **State Agency Reports**

**1.**     **Mental Impairments**

On December 4, 2017, state agency reviewing psychologist Robyn Murry-Hoffman, Ph.D., reviewed the record and opined that Powe had moderately limitation in his ability to carry out detailed instructions, maintain attention and concentration for extended periods. Dr. Murry-Hoffman opined that Powe would be able to complete simple, routine tasks and some moderately complex tasks/instructions.  (*Id*. at 81, 97.)

On February 9, 2018, state agency reviewing psychologist Derryck Richardson, Ph.D., reviewed the file and opined that Powe had moderate limitation in his ability to understand, remember, and carry out detailed instructions.  Dr. Richardson opined that Powe could understand and remember three to four step instructions and complete simple, routine tasks and some moderately complex tasks/instructions.  (*Id*. at 115-16, 131-32.)

**2.**     **Physical Impairments**

On November 9, 2017, state agency reviewing physician Diane Manos reviewed the file and opined that Powe had the following limitations to his physical residual functional capacity:

•        limited to lifting twenty pounds occasionally and ten pounds frequently;

- could stand and /or walk six hours in an eight-hour workday;

- could sit for six hours out of an eight-hour workday;

- could never climb ladders, ropes or scaffolds;

- could occasionally climb ramps, stairs, stoop, kneel, crouch, and crawl; and

- must avoid unprotected heights, hazards, commercial driving and heavy machinery.

(*Id*. at 78-9, 94-6.)

This opinion was confirmed by state agency reviewing physicians Elizabeth Das on February 9, 2018. (*Id*. at 112-14, 128-30.)

**D. Hearing Testimony**

During the March 8, 2019 hearing, Powe testified to the following:

- He was born in May 1989, and currently lives in Parma with his sister and her boyfriend. He has never lived independently. (*Id*. at 46.)

- He has never had a driver's license because of his seizure disorder. (*Id*. at 46-7.)

- He graduated from high school and went to vocational school to be a mechanic, but can't do that work because of his shoulder. (*Id*. at 47.)

- When he needs to go places, his sister or mom drive him. He has never taken the bus, because he has always been able to count on them. (*Id*. at 47-8.)

- He spends his days watching tv or movies and walking his dog. His dog is eleven years old, and he takes care of it. (*Id*. at 48.)

- He does light household chores like cleaning and washes his own clothes. (*Id*.)

- He cleans his own room, makes his own food, and purchases groceries when his mom takes him shopping once a week. (*Id*. at 49.)

- His hobbies include reading and hanging out with friends from school. (*Id*.)

- He is 5 feet 8 inches tall, weights 110 pounds, and is right-handed. (*Id*. at 50.)

- He cannot work because of his shoulder and his headaches. (*Id*.)

25

- Because of his shoulder, he can only lift seven pounds or less, no higher that shoulder level, and also has limited stretching to the side. (*Id.* at 51.)

- He cannot lift his arm above his head. He is still receiving physical therapy once a week. (*Id.* at 52.)

- He has had shoulder difficulties since he dislocated it six years ago. (*Id.* at 52-3.)

- A couple of times a month he has headaches that keep him on the couch or in his bedroom for one or two days. He takes ibuprofen and lies in a dark room. He has had problems with headaches his whole life, but they've gotten a little worse over time. (*Id.* at 53.)

- The last time he was hospitalized for a headache was January 2019. He was discharged the same day. (*Id.* at 54.)

- He has applied for jobs, but been rejected because of his lack of work history and his shoulder. (*Id.*)

- He worked in his Dad's bar, but it closed. He worked at Swenson's part-time for two months, but it was too fast-paced, he couldn't memorize the codes they use, and he had to quit because he needed another shoulder surgery. He missed one day of work due to a headache. (*Id.* at 56.)

The ALJ stated that Powe had no past work. (*Id.* at 58.) The ALJ then posed the following hypothetical question to the VE:

> [A]ssume a hypothetical individual of the claimant's age and education and with no past work experience. Further assume this individual is limited as follows. This is a light exertion hypothetical with the following additional limitations. This individual can occasionally reach overhead with the left upper extremity and frequently reach in all other directions with the left upper extremity. This person can only occasionally climb ramps and stairs, and never ladders, ropes, or scaffolds. Can occasionally balance, stoop, crouch , and crawl. This person can never work at unprotected heights, near dangerous moving machinery and cannot engage in commercial driving. Moreover, this person is limited to performing simple, routine, and repetitive tasks. Can this hypothetical individual perform any work in the national economy?

(*Id.*)

The VE testified the hypothetical individual would be able to perform representative jobs in

26

the economy, such as cashier, sales attendant, or mailroom clerk.  (*Id.*)

The ALJ next revised the hypothetical to add the limitation that the individual never reach overhead with the left upper extremity and only occasionally reach in all other directions with the left upper extremity.  (*Id*. at 59.)  The E testified that the same jobs would remain available.  (*Id*.)

The VE also testified that, based on her experience and training, a worker who is absent at a rate on one day a month or less, averaged over a twelve-month period, would be able to sustain employment.  (*Id*.)

### III.   STANDARD FOR DISABILITY

In order to establish entitlement to DIB under the Act, a claimant must be insured at the time of disability and must prove an inability to engage "in substantial gainful activity by reason of any medically determinable physical or mental impairment," or combination of impairments, that can be expected to "result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 20 C.F.R. §§ 404.130, 404.315 & 404.1505(a).

A disabled claimant may also be entitled to receive SSI benefits.  20 C.F.R. § 416.905; *Kirk v. Sec'y of Health & Human Servs*., 667 F.2d 524 (6th Cir. 1981).  To receive SSI benefits, a claimant must meet certain income and resource limitations.  20 C.F.R. §§ 416.1100 & 416.1201.

The Commissioner reaches a determination as to whether a claimant is disabled by way of a five-stage process.  20 C.F.R. §§ 404.1520(a)(4) *and* 416.920(a)(4).  *See also Ealy v. Comm'r of Soc. Sec*., 594 F.3d 504, 512 (6th Cir. 2010);  *Abbott v. Sullivan*, 905 F.2d 918, 923 (6th Cir. 1990). First, the claimant must demonstrate that he is not currently engaged in "substantial gainful activity" at the time of the disability application.  20 C.F.R. §§ 404.1520(b) & 416.920(b).  Second, the claimant must show that he suffers from a "severe impairment" in order to warrant a finding of

disability. 20 C.F.R. §§ 404.1520(c) & 416.920(c). A "severe impairment" is one that "significantly limits . . . physical or mental ability to do basic work activities." *Abbot*, 905 F.2d at 923. Third, if the claimant is not performing substantial gainful activity, has a severe impairment that is expected to last for at least twelve months, and the impairment, or combination of impairments, meets or medically equals a required listing under 20 CFR Part 404, Subpart P, Appendix 1, the claimant is presumed to be disabled regardless of age, education or work experience. *See* 20 C.F.R. §§ 404.1520(d) & 416.920(d). Fourth, if the claimant's impairment or combination of impairments does not prevent him from doing his past relevant work, the claimant is not disabled. 20 C.F.R. §§ 404.1520(e)-(f) & 416.920(e)-(f). For the fifth and final step, even if the claimant's impairment does prevent him from doing his past relevant work, if other work exists in the national economy that the claimant can perform, the claimant is not disabled. 20 C.F.R. §§ 404.1520(g), 404.1560(c) , & 416.920(g).

Here, in order to be entitled to DIB, Powe must establish a continuous twelve-month period of disability that began before his 22nd birthday. Any discontinuity in the twelve-month period precludes an entitlement to benefits. *See Mullis v. Bowen*, 861 F.2d 991, 994 (6th Cir. 1988); *Henry v. Gardner*, 381 F.2d 191, 195 (6th Cir. 1967).

### IV.    SUMMARY OF COMMISSIONER'S DECISION

The ALJ made the following findings of fact and conclusions of law:

1. Born on May **, 1989, the claimant had not attained age 22 as of January 1, 2011, the alleged onset date (20 CFR 404.102, 416.120(c)(4) and 404.350(a)(5)).

2. The claimant has not engaged in substantial gainful activity since January 1, 2011, his alleged onset date of disability (20 CFR 404.1571 et seq., and 416.971 et seq.).

3. The claimant has the following severe impairments: epilepsy, migraines, congenital hydrocephalus with associated shunt placements, left shoulder osteoarthritis with associated surgery, and cognitive disability (20 CFR 404.1520(c) and 416.920(c).

4. The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925 and 416.926).

5. The claimant has the residual functional capacity (RFC) to perform light work as defined in 20 CFR 404.1567(b) and 416.967(b) except he can never reach overhead or more than occasionally in all other directions with his left upper extremity. He can occasionally climb ramps and stairs, but never climb ladders, ropes, or scaffolds. He can occasionally balance, stoop, crouch, and crawl. He can never work at unprotected heights or around dangerous moving machinery. He must avoid commercial driving. He is able to perform simple, routine, and repetitive tasks. He may be absent one day per month.

6. The claimant has no past relevant work (20 CFR 404.1565 and 416.965).

7. The claimant was born on May **, 1989 and was 21 years old, which is defined as a younger individual age 18-49, on his alleged disability onset date (20 CFR 404.1563 and 416.963).

8. The claimant has at least a high school education and is able to communicate in English (20 CFR 404.1564 and 416.964).

9. Transferability of job skills is not an issue because the claimant does not have past relevant work (20 CFR 404.1568 and 416.968).

10. Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 CFR 404.1569, 404.15969, 416.969 and 416.969a).

11. The claimant has not been under a disability, as defined in the Social Security Act, from January 1, 2011, through the date of this decision (20 CFR 404.350(a)(5), 404.1520(g) and 416.920(g)).

(Tr. 17-30.)

## V.  STANDARD OF REVIEW

"The Social Security Act authorizes narrow judicial review of the final decision of the Social Security Administration (SSA)."  *Reynolds v. Comm'r of Soc. Sec.*, ,424 F. App'x 411, 414 (6th Cir. 2011).  Specifically, this Court's review is limited to determining whether the Commissioner's decision is supported by substantial evidence and was made pursuant to proper legal standards.  *See Ealy v. Comm'r of Soc. Sec.*, 594 F.3d 504, 512 (6th Cir. 2010); *White v. Comm'r of Soc. Sec.*, 572 F.3d 272, 281 (6th Cir. 2009).  Substantial evidence has been defined as "'more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'"  *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007) (quoting *Cutlip v. Sec'y of Health and Human Servs.*, 25 F.3d 284, 286 (6th Cir. 1994)).  In determining whether an ALJ's findings are supported by substantial evidence, the Court does not review the evidence *de novo*, make credibility determinations, or weigh the evidence.  *Brainard v. Sec'y of Health & Human Servs.*, 889 F.2d 679, 681 (6th Cir. 1989).

Review of the Commissioner's decision must be based on the record as a whole.  *Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 535 (6th Cir. 2001).  The findings of the Commissioner are not subject to reversal, however, merely because there exists in the record substantial evidence to support a different conclusion.  *Buxton v. Halter*, 246 F.3d 762, 772-3 (6th Cir. 2001) (citing *Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986)); *see also Her v. Comm'r of Soc. Sec.*, 203 F.3d 388, 389-90 (6th Cir. 1999)("Even if the evidence could also support another conclusion, the decision of the Administrative Law Judge must stand if the evidence could reasonably support the conclusion reached.")  This is so because there is a "zone of choice" within which the Commissioner can act, without the fear of court interference.  *Mullen*, 800 F.2d at 545 (citing *Baker v. Heckler*, 730 F.2d

1147, 1150 (8th Cir. 1984)).

In addition to considering whether the Commissioner's decision was supported by substantial evidence, the Court must determine whether proper legal standards were applied.  Failure of the Commissioner to apply the correct legal standards as promulgated by the regulations is grounds for reversal.  *See, e.g.,White v. Comm'r of Soc. Sec.*, 572 F.3d 272, 281 (6th Cir. 2009); *Bowen v. Comm'r of Soc. Sec.*, 478 F.3d 742, 746 (6th Cir. 2006) ("Even if supported by substantial evidence, however, a decision of the Commissioner will not be upheld where the SSA fails to follow its own regulations and where that error prejudices a claimant on the merits or deprives the claimant of a substantial right.").

Finally, a district court cannot uphold an ALJ's decision, even if there "is enough evidence in the record to support the decision, [where] the reasons given by the trier of fact do not build an accurate and logical bridge between the evidence and the result." *Fleischer v. Astrue*, 774 F. Supp. 2d 875, 877 (N.D. Ohio 2011) (quoting *Sarchet v. Chater,* 78 F.3d 305, 307 (7th Cir. 1996); accord *Shrader v. Astrue*, No. 11  13000, 2012 WL 5383120, at *6 (E.D. Mich. Nov. 1, 2012) ("If relevant evidence is not mentioned, the Court cannot determine if it was discounted or merely overlooked."); *McHugh v. Astrue*, No. 1:10  cv  734, 2011 WL 6130824 (S.D. Ohio Nov. 15, 2011); *Gilliam v. Astrue*, No. 2:10  CV  017, 2010 WL 2837260 (E.D. Tenn. July 19, 2010); *Hook v. Astrue*, No. 1:09  cv  1982, 2010 WL 2929562 (N.D. Ohio July 9, 2010).

## VI.  ANALYSIS

### A.       First Assignment of Error: The Opinion of Dr. Iannotti

Powe asserts that the ALJ erred in finding the opinion of Dr. Iannotti "not persuasive." (Doc. No. 14 at 25.)  He argues that because the medical evidence is supportive of and consistent

31

with Dr. Iannotti's opinion, the ALJ should have afforded it greater weight.  (*Id.*)

The Commissioner responds that the ALJ properly analyzed Dr. Iannotti's opinion under the Revised Regulations, and cited substantial evidence for his determination that the opinion was inconsistent with the longitudinal medical record.  (Doc. No. 15 at 16-18.)

Since Powe's claim was filed after March 27, 2017, the Social Security Administration's new regulations ("Revised Regulations")  for evaluation of medical opinion evidence apply to his claim. *See Revisions to Rules Regarding the Evaluation of Medical Evidence (Revisions to Rules)*, 2017 WL 168819, 82 Fed. Reg. 5844 (Jan. 18, 2017); 20 C.F.R. § 404.1520c.

Under the Revised Regulations, the Commissioner will not "defer or give any specific evidentiary weight, including controlling weight, to any medical opinion(s) or prior administrative medical findings, including those from your medical sources." 20 C.F.R. § 416.920c(a).  Rather, the Commissioner shall "evaluate the persuasiveness" of all medical opinions and prior administrative medical findings using the factors set forth in the regulations: (1) supportability;[4] (2) consistency;[5] (3) relationship with the claimant, including length of the treatment relationship, frequency of examinations, purpose of the treatment relationship, extent of the treatment relationship, and examining relationship; (4) specialization; and (5) other factors, including but not limited to evidence

---

[4]    The Revised Regulations explain the "supportability" factor as follows: "The more relevant the objective medical evidence and supporting explanations presented by a medical source are to support his or her medical opinion(s) or prior administrative medical finding(s), the more persuasive the medical opinions or prior administrative medical finding(s) will be." 20 C.F.R. § 404.1520c(c)(1).

[5]    The Revised Regulations explain "consistency" factor as follows: "The more consistent a medical opinion(s) or prior administrative medical finding(s) is with the evidence from other medical sources and nonmedical sources in the claim, the more persuasive the medical opinion(s) or prior administrative medical finding(s) will be." 20 C.F.R. § 404.1520c(c)(2).

showing a medical source has familiarity with the other evidence in the claim or an understanding of the agency's disability program's policies and evidentiary requirements.  20 C.F.R. §§ 416.920c(a), (c)(1)-(5).  However, supportability and consistency are the most important factors. 20 C.F.R. §§ 416.920c(a), 404.920(b)(2).

The Revised Regulations also changed the articulation required by ALJs in their consideration of medical opinions.  The new articulation requirements are as follows:

> (1) Source-level articulation. Because many claims have voluminous case records containing many types of evidence from different sources, it is not administratively feasible for us to articulate in each determination or decision how we considered all of the factors for all of the medical opinions and prior administrative medical findings in your case record. Instead, when a medical source provides multiple medical opinion(s) or prior administrative medical finding(s), we will articulate how we considered the medical opinions or prior administrative medical findings from that medical source together in a single analysis using the factors listed in paragraphs (c)(1) through (c)(5) of this section, as appropriate. We are not required to articulate how we considered each medical opinion or prior administrative medical finding from one medical source individually.

> (2) Most important factors. The factors of supportability (paragraph (c)(1) of this section) and consistency (paragraph (c)(2) of this section) are the most important factors we consider when we determine how persuasive we find a medical source's medical opinions or prior administrative medical findings to be. Therefore, we will explain how we considered the supportability and consistency factors for a medical source's medical opinions or prior administrative medical findings in your determination or decision. We may, but are not required to, explain how we considered the factors in paragraphs (c)(3) through (c)(5) of this section, as appropriate, when we articulate how we consider medical opinions and prior administrative medical findings in your case record.

> (3) Equally persuasive medical opinions or prior administrative medical findings about the same issue. When we find that two or more medical opinions or prior administrative medical findings about the same issue are both equally well-supported (paragraph (c)(1) of this section) and consistent with the record (paragraph (c)(2) of this section) but are not exactly the same, we will articulate how we considered the other most persuasive factors in

          paragraphs (c)(3) through (c)(5) of this section for those medical opinions or prior administrative medical findings in your determination or decision.

20 C.F.R. § 416.920c(b)(1)-(3).

      "Although the regulations eliminate the 'physician hierarchy,' deference to specific medical opinions, and assigning 'weight' to a medical opinion, the ALJ must still 'articulate how [he/she] considered the medical opinions' and 'how persuasive [he/she] find[s] all of the medical opinions.'" *Ryan L.F. v. Comm'r of Soc. Sec.*, No. 6:18-cv-01958-BR, 2019 WL 6468560, at *4 (D. Ore. Dec. 2, 2019) (quoting 20 C.F.R. §§ 404.1520c(a) & (b)(1), 416.920c(a) & (b)(1)). A reviewing court "evaluates whether the ALJ properly considered the factors as set forth in the regulations to determine the persuasiveness of a medical opinion." *Id.*

      Dr. Iannotti competed a physical medical source statement on May 16, 2018, in which he opined that Powe was limited to lifting 20 pounds occasionally, and 5 pounds frequently due to his left shoulder limitations. (Tr. 3002-03.) He further opined that Powe's ability to stand, walk and sit were not limited, but Powe had only a rare ability to climb, stoop, kneel, crawl, reach and push/pull due to his left shoulder injury. (*Id.*) Dr. Iannotti opined that Powe's severe pain would interfered with his concentration, take him off task and caused absenteeism. (*Id.*) Dr. Iannotti noted Powe had a history of migraines, seizures, congenital hydrocephalus, shunt placement, and 12 shunt revisions. (*Id.* at 3003.)

      The ALJ addressed Dr. Iannotti's opinion as follows:

In May 2018, Joseph Iannotti, M.D., at the behest of the claimant's mother, completed a functional capacity assessment and opined that the claimant could occasionally lift 20 pounds and frequently lift five pounds but could rarely climb, stoop, kneel, crawl, reach, push, or pull. Dr. Iannotti opined that the claimant's pain would interfere with concentration, take him off task, and cause absenteeism. Dr. Iannotti opined that the claimant would require some additional rest time on an average day. I find Dr. Iannotti's assessment overall to be unpersuasive, as he did not

> support the extreme postural limitations, indication of impaired concentration, or
> need for excessive absenteeism or rest with actual treatment findings on exam, and
> such extreme limitations are inconsistent with the longitudinal record documenting
> generally unremarkable physical exam findings and a normal ability to ambulate.

(*Id*. at 27) (internal citations omitted).

The ALJ supported his determination that Powe's treatment providers generally reported normal physical examination findings that were inconsistent with the extreme limitations proposed by Dr. Iannotti's Medical Source Statement with medical evidence discussed earlier in his Decision. (Tr. 23-26, citing Tr. 345-46, 1176, 1183-84, 1196-97, 1214, 1219, 1395, 1480, 1512-13, 1718, 2767, 2866, 2983, 3009-10, 3077, 3081.) Dr. Iannotti, an orthopedist, did not explain how Powe's left shoulder impairment would limit his ability to stoop and kneel. While he mentioned Powe's history of migraines, he did not cite them as a basis for his opined limitations, instead his findings that Powe's severe pain would interfere with his concentration, take him off-task and cause absenteeism were based on his shoulder impairment. Dr. Iannotti's opinion is consistent with contemporaneous medical records,[6] which showed that Powe injured his shoulder shoveling snow shortly before May 15, 2017. (*Id*. at 1492.) Only five months after Dr. Iannotti authored his opinion, Powe underwent a shoulder replacement. (Tr. 3056.) However, the record documented that this surgery was successful, and following post-surgical physical therapy, Powe reported decreased pain, and improvement in his active range of motion. (*Id*. at 3040-41.) Three months after the surgery - and eight months after Dr. Iannotti rendered his opinion - Powe reported to his orthopaedic surgeon that his pain was decreased to only "occasional" and that he was doing well. (*Id*. at 3094.)

---

[6]     For example, as Powe notes, Dr. Iannotti's opinion is consistent with the letter provided by surgeon Dr. Gobezie in August 2018, immediately prior to Powe's shoulder replacement. (Tr. 3008.) The ALJ addressed Dr. Gobezie's opinion, and cogently explained why he deemed it "unpersuasive." (*Id*. at 27.)

Therefore, the ALJ reasonably concluded that the extreme limitations in Dr. Iannotti's opinion were inconsistent with the longitudinal record, although they may have been accurate as of the date of the opinion.

Powe argues that the ALJ improperly evaluated Dr. Iannotti's opinion because he limited his analysis to the factors of supportability and consistency.  (Doc. No. 14 at 28.)  However, under the Revised Regulations, the ALJ is not required to discuss factors such as the nature and extent of the treating relationship or the specialty of the opining provider unless he deems two differing medical opinions equally well-supported and consistent with the record.  20 C.F.R. §§ 404.1520c(b)(3), 416.920c(b)(3) (2017).  Further, while Powe points to other record evidence which is supportive of greater RFC limitations, such as those in Dr. Iannotti's opinion, Dr. Ionnetti did not support his opinion with evidence beyond reference to Powe's diagnoses.  Nor does Powe assert that the ALJ omitted this evidence from consideration.  The ALJ identified substantial evidence which supported his determination, and it is not the role of this Court to re-weigh evidence.  The ALJ has provided a clear and coherent explanation of his reasoning, supported by substantial evidence, with regard to Dr. Iannotti's opinion, and therefore this assignment of error lacks merit.

**B.      Second Assignment of Error: Whether Substantial Evidence Supports the RFC**

Powe asserts that the ALJ erred by failing to support his determination of RFC with substantial evidence.  (Doc. No. 14 at 29.)  He argues that Powe has further limitations which the ALJ did not recognize, specifically, limitations which result from Mr. Powe's migraine headaches, which were recognized as a severe impairment. (*Id*.)

The Commissioner responds that the ALJ fully considered the evidence pertaining to Powe's headache-related complaints and accounted for them in his RFC finding to the extent that they were

36

supported by the record evidence. (Doc. No. 15 at 20.)

The RFC determination sets out an individual's work-related abilities despite his or her limitations. *See* 20 C.F.R. § 416.945(a). A claimant's RFC is not a medical opinion, but an administrative determination reserved to the Commissioner. *See* 20 C.F.R. § 416.927(d)(2). An ALJ "will not give any special significance to the source of an opinion on issues reserved to the Commissioner." *See* 20 C.F.R. § 416.927(d)(3). As such, the ALJ bears the responsibility for assessing a claimant's RFC based on all of the relevant evidence, 20 C.F.R. § 416.946(C), and must consider all of a claimant's medically determinable impairments, both individually and in combination. *See* SSR 96-8p, 1996 WL 374184 (July 2, 1996).

"In rendering his RFC decision, the ALJ must give some indication of the evidence upon which he is relying, and he may not ignore evidence that does not support his decision, especially when that evidence, if accepted, would change his analysis." *Fleischer*, 774 F. Supp. 2d at 880 (citing *Bryan v. Comm'r of Soc. Sec.*, 383 F. App'x 140, 148 (3d Cir. 2010) ("The ALJ has an obligation to 'consider all evidence before him' when he 'mak[es] a residual functional capacity determination,' and must also 'mention or refute [...] contradictory, objective medical evidence' presented to him.")). *See also* SSR 96 8p, 1996 WL 374184 at *7 ("The RFC assessment must always consider and address medical source opinions. If the RFC assessment conflicts with an opinion from a medical source, the adjudicator must explain why the opinion was not adopted.")). While the RFC is for the ALJ to determine, however, it is well established that the claimant bears the burden of establishing the impairments that determine his RFC. *See Her*, 203 F.3d at 391.

The ALJ identified Powe's migraines as a severe impairment. (Tr. 17.) He found that due

to headaches[7] and possible dizziness from his hydrocephalus condition, Powe could not work at unprotected heights or around dangerous moving machinery; must avoid commercial driving.  (*Id.* at 26.)  Due to cognitive disability and headaches, he limited Powe to simple, routine, and repetitive tasks; and found he may be absent one day per month.  (*Id.*)

Powe argues that the ALJ should have found additional limitations.  First, he argues that "medical records stated that triggers for Mr. Powe's headaches included bright lights and loud noises, " and therefore environmental limitations restricting exposure to light and noise are needed. (Doc. No. 14 at 30.)  Powe cites one medical record, from an exam three years prior to his alleged onset date, which lists these triggers.  (*Id.*, citing Tr. 1355.)  However, substantial evidence in the record, including Powe's own testimony, demonstrates that he had no triggers for his headaches, although he sometimes experienced photophobia and phonophobia once they began.  At his hearing, Powe and his attorney had the following exchange:

Q:      Are there any triggers to your migraines?

A:      No.

(Tr. 54.)  Further, during the relevant period, Powe repeatedly reported to his treatment providers that his headaches were not associated with any photophobia  or phonophobia.  (*Id.* at 1414, 1424, 2861.)  At other times, he reported to treatment providers that his headaches had no precipitating factors, but involved photophobia and phonophobia once they had begun.  (*Id.* at 1829, 2765.) Therefore, Powe has not identified substantial evidence in the record establishing this additional limitation.

---

[7]      The ALJ did not distinguish between headaches resulting from migraines and headaches resulting from hydrochephalus, as Powe explained that he was unable to distinguish between the two.  (Tr. 55.)

Next, Powe argues that the ALJ should have included a greater amount of absenteeism based on his headache history.  (Doc. No. 14 at 30.)  He notes that:

> Powe was seen in the emergency room or hospitalized for his headaches 2 days in October 2007 (Tr. 743), two days in December 2007 (Tr. 748), two days in November 2010 (Tr. 757), one day in October 2011 (Tr. 1214), three days in November 2011 (Tr. 1827), one day in May 2013 (Tr. 1203), three days in October 2013 (Tr. 1197, 1798), one day in December 2014 (Tr. 1183), one day in August 2015 (Tr. 1717), one day in July 2016 (Tr. 1176), three days in November 2016 (Tr. 1690), three days in May 2017 (Tr. 1292), five days in June 2017 and ten days in July 2017 (Tr. 1540), two days in August 2017 (Tr. 2744), thirteen days in October 2017 (Tr. 2765, 2807), two days in November 2017, one day in December 2017 (Tr. 2844), two days in November 2018, (Tr. 3014, 3077), three days in 2019 (Tr. 3014, 3115), and three days in April 2019 (Tr. 3115).

(*Id*. at 30-31.)  As the Commissioner points out, this list show that, with the exception of the period from May to December 2017, when Powe was hospitalized for a total of 36 days due to multiple shunt revision procedures, he was hospitalized no more than four days per year.  (Doc. No. 15 at 22.) Excluding the May to December 2017 period, he was hospitalized for his headaches 28 total days in the 11 years between 2007 and 2019 (excluding 2017), an average of 2.5 days per year.  While Powe argues the records of his hospitalizations do not account for all of the days he was impaired by headaches, the ALJ accommodated that additional impairment by providing 12 days of absence annually.  (Doc. No. 14 at 31, Tr. 22.)  Substantial evidence supports the ALJ's RFC determination, and therefore, this assignment of error is without merit.

**C.      Third Assignment of Error: Analysis of Migraine Pain**

Powe's final assignment of error is closely related to the issue of whether the RFC adequately accommodated impairments resulting from Powe's headaches.  He asserts that the ALJ did not provide a complete or proper pain analysis of Powe's migraine headaches, as required by Social Security regulation ("SSR") 16-3P.  (Doc. No. 14 at 32.)

39

The Commissioner responds that the ALJ appropriately considered the medical records as well as Powe's self-reported level of activity, and found them to be "inconsistent with the level and persistence of symptoms alleged" (Doc. No.15 at 21, citing Tr. 28.)

The ALJ's assessment of symptoms, formerly referred to as the "credibility" determination in SSR 96-7p, was clarified in SSR 16-3p, to remove the word "credibility" and refocus the ALJ's analysis on the "extent to which the symptoms can reasonably be accepted as consistent with the objective medical and other evidence in the individual's record." SSR 16-3p, 2017 WL 5180304 at *2 (October 25, 2017) (emphasis added). Under SSR 16-3p, an ALJ is to consider all of the evidence in the record in order to evaluate the limiting effects of a plaintiff's symptoms, including the following factors:

> 1. Daily activities;
>
> 2. The location, duration, frequency, and intensity of pain or other symptoms;
>
> 3. Factors that precipitate and aggravate the symptoms;
>
> 4. The type, dosage, effectiveness, and side effects of any medication an individual takes or has taken to alleviate pain or other symptoms;
>
> 5. Treatment, other than medication, an individual receives or has received for relief of pain or other symptoms;
>
> 6. Any measures other than treatment an individual uses or has used to relieve pain or other symptoms (e.g., lying flat on his or her back, standing for 15 to 20 minutes every hour, or sleeping on a board); and
>
> 7. Any other factors concerning an individual's functional limitations and restrictions due to pain or other symptoms.

*Id.*, 2017 WL 5180304, at *7-8; see also 20 C.F.R. §§ 404.1529(c), 416.929(c) and former SSR 96-7p.

Although SSR 16-3 clarified the rules concerning subjective symptom evaluation and

removed the term "credibility" from the regulations, courts in this Circuit concur that the procedures for judicial review of an ALJ's assessment under SSR 16-3p, are substantially the same as the procedures under SSR 96-7p. *See, e.g., Delong v. Comm'r of Soc. Sec.*, No. 2:18-cv-368, 2019 WL 409364 (S.D. Ohio Feb. 1, 2019).  The prior case law remains fully applicable to the renamed "consistency determination" under SSR 16-3p, "to the extent it is consistent with the clarification of the rules embodied in SSR 16-3p's clarification." *Duty v. Comm'r of Soc. Sec.*, No. 2:17-cv-445, 2018 WL 4442595 at *6 (S.D. Ohio Sept. 18, 2018); *Whicker-Smith v. Comm'r of Soc. Sec.*, No. 1:18-cv-52. 2019 WL 911084 at *5 (S.D. Ohio Feb. 25, 2019).

This means that the ALJ must evaluate the individual's statements based on the entire case record.  The evaluation of a claimant's subjective complaints rest with the ALJ.  *See Siterlet v. Sec'y of Health & Human Servs.*, 823 F.2d 918, 920 (6th Cir. 1987); *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 248 (6th Cir. 2007) (noting that "credibility determinations regarding subjective complaints rest with the ALJ").  The ALJ's findings are entitled to considerable deference and should not be discarded lightly.  *See Villareal v. Sec'y of Health & Human Servs.*, 818 F.2d 461, 463 (6th Cir. 1987).  Nonetheless, the ALJ's "decision must contain specific reasons for the weight given to the individual's symptoms . . . and be clearly articulated so the individual and any subsequent reviewer can assess how the adjudicator evaluated the individual's symptoms."  SSR 16-3p, 2016 WL 1119029; *see also Felisky v. Bowen*, 35 F.2d 1027, 1036 (6th Cir. 1994) ("If an ALJ rejects a claimant's testimony as incredible, he must clearly state his reason for doing so").

Here, the ALJ has met the burden of clearly articulating the basis for his evaluation of the impairment resulting from Powe's headache pain.  As discussed in section B, *supra*, the medical record provided substantial evidence for his determination.  The ALJ also considered Powe's self-

reports throughout the record, including:

- August 2013, Powe reported that his migraine headaches were well controlled, with a frequency of about only one per month  (Tr. 24, citing1414);

- November 2013, Powe reported that his headaches were well controlled with a frequency of about one per month (Tr. 24, citing 1424);

- November 2016, Powe reported that he felt much better and was having no headaches (Tr. 24, citing 844); and

- February 2018, Powe reported that he had headaches about once per month (Tr. 25, citing 2999).

Further, the ALJ considered Powe's activities of daily living, explaining that Powe's "level of activity, as summarized throughout this decision, is inconsistent with the level and persistence of symptoms alleged" (Tr. 28).  The activities summarized by the ALJ included evidence that, despite his headaches, Powe was able to graduate from high school and attend a vocational program to be a mechanic. (Tr. 21, citing Tr. 47.)  Powe testified that he was unable to work as a mechanic after completing his training because of his shoulder impairment, not headache pain.  (*Id*. at 47.)  During two months of part-time employment at Swenson's, he missed only one day of work due to headache pain, and he ended his employment because of his scheduled shoulder surgery.  (*Id*. at 56.)  Powe testified that he took care of his pet dog, did light housecleaning, washed his own clothes, made his own food, went grocery shopping with his mother once a week, and was able to count change, handle a savings account, and use a checkbook.  (Tr. 20-21, citing Tr. 47-49, 270.)  The ALJ also noted that Powe testified that he enjoyed reading autobiographies, watching television and movies, and hanging out with friends from school a couple times per week at a local dive bar.  (Tr. 20-21, citing Tr. 49-50, 272.)

The ALJ considered the record evidence as a whole, including Powe's daily activities, his

record of hospitalization for headache pain, and the frequency and duration of his headaches, in his evaluation of Powe's pain symptoms. Powe asserts that the ALJ overlooked factors related to his medications and lists the drugs in the "migraine cocktail" he received on the rare occasions he was hospitalized with headache, but Powe testified he used ibuprofen as his home treatment for to headache pain, and reported no side effects, making this factor irrelevant. (Doc. No. 15 at 33; Tr. at 53.) Other treatments, such as lying down in a dark room, were addressed and accommodated by the ALJ's absenteeism limitation in the RFC. The ALJ properly applied SSR 16-3p and clearly articulated his analysis of Powe's headache pain, and therefore this assignment of error lacks merit.

## VII.    CONCLUSION

For the foregoing reasons, the Magistrate Judge recommends that the Commissioner's final decision be AFFIRMED.


s/Jonathan D. Greenberg
Jonathan D. Greenberg
United States Magistrate Judge


Date: December 31, 2020


## OBJECTIONS

Any objections to this Report and Recommendation must be filed with the Clerk of Court within fourteen (14) days after the party objecting has been served with a copy of this Report and Recommendation. 28 U.S.C. § 636(b)(1). Failure to file objections within the specified time may waive the right to appeal the District Court's order. *See United States v. Walters*, 638 F.2d 947 (6th Cir. 1981); *Thomas v. Arn*, 474 U.S. 140 (1985), *reh'g denied*, 474 U.S. 1111 (1986).